UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IVAN DIAZ (PLAINTIFF) | : | CASE NO. 14CV323JBA |
| V. | : | |
| LEO C. ARNONE | : | HON. _____ |
| CAPTAIN KELLY | : | |
| LANCE MORRIS | : | MAG. _____ |
| JOHN DOE #1 | : | |
| WILLIAM BLUMENTHAL | : | JURY TRIAL REQUESTED |
| SEAN MCGUINNESS (DEFENDANTS) | : | DATE: _____ |

VERIFIED COMPLAINT FOR DAMAGES
AND DECLARATORY JUDGEMENT

I. Introduction.

1. This is a civil action filed by the Plaintiff Ivan Diaz, a state prisoner, alleging violation of his Federal and State Constitutional rights prohibiting false arrest, maliscious prosecution, and abuse of legal process. For which plaintiff seeks declaratory judgement and money damages.

II. Jurisdiction.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, in that this is a civil action arising under the Constitution(s) of the United States and the State of Connecticut.

3. Jurisdiction of this Court is also invoked pursuant to 28 U.S.C. §1343(a)(3), in that this action seeks redress for the deprivation under color of state law, of rights secured by Acts of Congress providing for equal rights within the jurisdiction of the United States.

III. <u>Parties</u>.

4. The plaintiff, Ivan Diaz, at all times relevant to this complaint, was confined at Garner Correctional Institution (GCI), located at: 50 Nunnawauk Road, Newtown, CT 06457. And is now presently housed at MacDougall-Walker Correctional Institution (MWCI), located at: 1153 East Street South, Suffield, CT 06080.

5. Defendant Leo C. Arnone, at all times relevant to this complaint, was the Commissioner of Connecticut's Department Of Correction (CDOC), located at: 24 Wolcott Hill Road, Wethersfield, CT 06109. His job duties entail overseeing the CDOC's daily operations, which include, among other things, all investigations and any criminal charges filed against inmates in the various facilities across the state. Defendant Arnone, is being sued in his individual and official capacities.

6. Defendant Investigator Captain Kelly, is an employee of the CDOC's main office at Wethersfield, CT. His jod duties entail investigating all complaints concerning inmates and staffs alike, writing out reports of such matters and fowarding them to his supervisors for final dispositions. Such as: punitive sanctions, criminal charges, or designation of

the subjects of such investigations. The Commissioner of Correction has last say on all investgations handled by the Central Office's investigators. Defendant Captain Kelly is being sued in his individual and official capacities.

7. Defendant Lieutenant Lance Morris, at all times relevant to this complaint, was an employee of the CDOC, stationed at GCI. His duties entailed the handling of the facility's Intelligence/Security Division, which investigates all complaints, incidents, or matters regarding the safety and security of the facility. Defendant Morris is being sued in his individual and official capacities.

8. Defendant John Doe #1, whose name is not presently known to the plaintiff, at all times relevant to this complaint, was an employee of the CDOC, stationed at GCI as a correctional officer. His job entails overseeing the daily operations of the facility and supervising staffs. Defendant John Doe #1 is being sued in his individual and official capacities.

9. Defendant William Blumenthal, at all times relevant to this complaint, was employed by the Department Of Public Safety's State Police Division. His job entailed investigating complaints, filing reports, charges, etc. Defendant Blumenthal is being sued in his individual and official capacities.

10. Defendant Sean McGuinness, at all times relevant to this complaint, was employed by the Connecticut Judicial Branch. He held the title of Deputy Assistant State's Attorney, responsible for prosecuting alleged criminal offenses within

his jurisdiction, etc. Defendant McGuinness is being sued in his individual and official capacities.

IV. <u>Factual Statements</u>.

11. On September 19, 2011, at about 8:45 a.m., Counselor Bethke and CTO Bukowski, employees of the CDOC at GCI, came to the plaintiff's cell door (A-105) and asked, both, his cell mate and the plaintiff to get dressed and step out of the cell. (They were conducting one of the institution's annual "shakedowns," wherein the entire facility is searched).

12. After about two hours, the plaintiff and his cell mate were allowed back into the cell.

13. A short time later, at about 11:35 a.m., another correctional officer came to the cell door and tells the plaintiff to get dressed to go to the lieutenant's office.

14. At the lieutenant's office, in front of several other officers and lieutenants, the plaintiff was asked by Lieutenant Lance Morris (hereinafter Lt. Morris), whether the two composition notebooks, some papers, and an address booklet that were removed from the plaintiff's assigned cell belonged to him. The plaintiff answered "yes". Lt. Morris then asked the plaintiff, whether he accepts responsibility for those items, and the plaintiff, again, responded "yes".

15. Thereafter, the plaintiff was escorted to the Restrictive Housing Unit (hereinafter seg), where he was made to get on his knees, while he was handcuffed behind his back and

4.

shackled, bend over the cell bunk and involuntarily stripped of his prison clothes, while being taped and humiliated.

16. Later that same evening, the plaintiff was given a disciplinary report (D/R) for <u>Possession of Contraband</u>, consisting of two razor blades that were merely removed from their original cartridges.

17. For the above infraction, the plaintiff was sanctioned with seven (7) days of punitive seg, followed by fifteen (15) days loss of recreation, seven (7) days loss of phone privileges, and two years loss of contact visits.

18. During the punitive seg time, on Wednesday, September 21, 2011. The plaintiff was escorted to Lt. Morris's office where he was questioned about a paper containing a complaint against a food service supervisor in another facility, which Lt. Morris could not decipher, because it was written in alphabetical characters of different languages.

19. After questioning the plaintiff, whether he was involved in gang activity, and whether he'd ever been to Nothern C.I. [a super max prison facility in Connecticut]. Lt. Morris asked the plaintiff, why he was writing in codes? To which the plaintiff explained that he was not writing in codes. That his writing consisted of alphabetical characters of the Old Hebrew, Greek, and Arabic languages from which he'd concocted his own alphabet. The plaintiff also explained to Lt. Morris that the reason for writing in that manner was to protect the privacy of the inmate for whom he had

5.

<u>edited</u> the complaint.

20. The complaint was written against a food service supervisor in Cheshire C.I., in or about the first quater of 2007. Alleging that the inmate, who was a kitchen worker at the time, was being accosted by the food service supervisor. That because the inmate did not heed the food supervisor's advances, he was fired from the kitchen. That complaint, which was an administrative grievance, was summarily dismissed.

21. The plaintiff gave Lt. Morris the alphabetical representation of each character, so that Lt. Morris could decipher the plaintiff's writing for himself.

22. On Friday, September 23, 2011, the plaintiff was again escorted to Lt. Morris's office. In the presence of Captain Eason, Correctional Officer Figueroa, and Deputy Warden Falcone. Lt. Morris asked the plaintiff, rhetorically, whether everything that was written in the complaint had happened to him. To which the plaintiff replied that none of it involved him (the plaintiff). The plaintiff, again, explained that he merely edited the complaint for another inmate, whose command in the English language was very poor. Lt. Morris, astonished, asked the plaintiff, "Why didn't you tell me this". To which the plaintiff responded, "You didn't aske me". Lt. Morris then said; "These allegations got the ball rolling again and started an investigation". The plaintiff told Lt. Morris that the complaint in question had been investigated and dismissed in 2007.

6.

23. Thereafter, Lt. Morris told the plaintiff that he was going to investigate the matter and if it was as the plaintiff had stated, he would let him out of seg on Monday, September 26, 2011.

24. On Tuesday, September 27, 2011, the plaintiff was once again escorted to Lt. Morris's office, where the Lieutenant informed him that he was being placed on Administrative Segregation until they get back to him from Cheshire C.I., wherein the complaint had been filed. The plaintiff remained in seg for what turned out to be two (2) additional weeks after he served his seven days of punitive seg.

25. On Friday, September 30, 2011. Lt. Morris was touring the Seg Unit and stopped in the plaintiff's assigned cell (F-210), and informed the plaintiff that the investigation had been completed and that he (the plaintiff) would be out of seg that afternoon. However, the plaintiff remained in seg until Friday, October 7, 2011, on which date he was transferred to MWCI.

26. On or about mid December 2011, while housed in the "ticket block" at the MacDougall facility of MWCI. The plaintiff was called to Deputy Warden Wright's office. In the presence of Captain Beaudry and Captain Manly, an investigator named Captain Kelly, from the CDOC's Intelligence/Security Division of the CDOC's Central Office in Wethersfield, CT, asked the plaintiff to take a seat. Captain Kelly then questioned the plaintiff about the matter surrounding the complaint.

7.

Specifically, whether or not the allegations made in the complaint were true. The plaintiff stated that they were not. The plaintiff also explained to Captain Kelly, that the complaint was not pertaining to him (the plaintiff), but was a rough draft version of the complaint edited for another inmate who could not write English.

27. Captain Kelly then asked the plaintiff whether he believed the allegations were true. To which the plaintiff responded, that he felt that the allegations were meritless, because after they were duly reviewed and investigated by the Grievance Committee in Cheshire C.I. The grievance was summarily dismissed in 2007.

28. After Captain Kelly asked the plaintiff to sign the computer generated affidavit. The plaintiff inquired about his two composition notebooks and address booklet and its contents. To which Captain Kelly responded that he had them in his possession and that he would return them, once the investigation was completed.

29. On January 10, 2012, after Captain Kelly's investigation, unbeknown to the plaintiff at the time. Trooper William Blumenthal was dispatched to GCI for a report of weapons found during a "shakedown." This was in regards to the "shakedown" that took place on September 19, 2011, four months earlier.

30. John Doe #1 filed a complaint against the plaintiff and based on that information, Trooper Blumenthal submitted an

application for an arrest warrant charging the plaintiff with two counts of: Possession of a weapon or a dangerous instrument in a correctional institution, a violation of Connecticut General Statute (C.G.S.) §53a-174a.

31. On January 13, 2012, the application was reviewed and signed by a State's Attorney at Danbury Superior Court, whose name is not known to the plaintiff.

32. On January 19, 2012, the application for the arrest warrant was reviewed by the Hon. John F. Blawie at Danbury Superior Court and an arrest warrant was issued for the plaintiff's arrest charging him with the offenses set forth above in paragraph (30) of this complaint.

33. On February 9, 2012, a month and a half after Captain Kelly's interview with the plaintiff at MWCI and nearly five months after the initial disciplinary report the plaintiff was given for Possession of Contraband, on September 19, 2012, at GCI. The plaintiff was awaken at 2:30 a.m., and escorted to MWCI' A/P Room, where he underwent a visual cavity search, placed in a bull pen for three and a half hours, then handcuffed and shackled (with a black [plastic] box over the handcuffs, with a belly chain [known as a Security Chain #2], which runs from the black boxed handcuffs to the shackles -- restricting the blood flow to the hands and the movement of the arms). In this position the plaintiff was transported to the Bridgeport Community Correctional Center (BCCC), a one hour and forty-five minute drive from MWCI.

34. After arriving at BCCC, the plaintiff was placed in an overcrowded cell for another two hours with nowhere to sit, before being handcuffed and shackled again, and transported to Danbury's Superior Court (another forty-five minute drive from Bridgeport), where he was served with a warrant charging him with the criminal offenses enumerated in paragraph (30) Of this complaint.

35. On or about March 3, 2012, the plaintiff was again summoned to court, undergoing the same ordeals and humiliations of strip searches and visual cavity searches at MWCI and BCCC, when going to and returning from court. Something that is not routinely done to an individual prisoner under normal prison conditions. Having to be handcuffed with a black box, belly chained, shackled, placed in an overcrowded bull pen, deprived of sleep and subjected to long hours uncomfortably bound "bull pen" therapy without probable cause or evidence of a crime.

36. The plaintiff was subjected to a number of court trips, under the conditions enumerated in paragraphs (33) through (35) of this complaint, between February 9, 2012 and March 3, 2013. In the course of these various court trips, the plaintiff was offered consecutive time. Finally, with an offer of unconditional discharge on two consecutive trips to court. The plaintiff was taken to court on back to back trips between February 9, 2012 and March 3, 2013 where he selected six jurors and one alternative.

X,2

37. On March 21, 2013, the plaintiff's assigned counsel, Attorney Mark Johnson, called the MWCI facility and left a message with CTO Mortimer of Q-Unit (MCI) for the plaintiff to call him back.

38. The plaintiff, through the CTO made a call to the Danbury Superior Court, but was unable to make contact with Attorney Johnson. So he left a message asking Mr. Johnson to call him back.

39. On March 22, 2013, again, the plaintiff was informed by CTO Mortimer that Attorney Johnson had called, but the CTO was not available. The CTO provided the plaintiff with a legal call to no avail.

40. On or about March 29, 2013, CTO Mortimer informed the plaintiff that Attorney Johnson called again and told him to tell the plaintiff that, all charges had been dismissed.

41. On April ____, 2013, the plaintiff wrote to his Attorney, Mark Johnson, requesting a copy of the charging document, arrest warrant and supporting affidavit, in order to file a notice of suit for: false arrest, maliscious prosecution, and abuse of legal process. The plaintiff, however, did not received the requested documents.

42. The plaintiff file an FOI [Freedom Of Information] form with with the Danbury Superior Court's Public Defenders Office. Only then, did he received a redacted copy of the said documents enumerated in paragraph 41 of this complaint. For which the plaintiff now brings this action.

11.

43. Upon receiving the redacted application for the arrest warrant along with the warrants and charging information. The plaintiff learned that after having been cleared in the complaint against the food service supervisor in Cheshire C.I. Steps were taken to procure a conviction and additional sentence against the plaintiff as set forth in paragraphs (29) through (36) of this complaint.

44. On July 2, 2013, after receiving the transcripts of the March 13, 2013 hearing in the matter of the criminal charges brought against the plaintiff, as set forth in paragraphs (29) through (36) of this complaint. The plaintiff learned that the State attempted to prosecute the case against him without evidence to support a conviction. For which the Court, Hon. John F. Blawie dismissed all criminal charges against the plaintiff.

V. Claims For Relief.

45. Defendant John Doe #1's action in filing the complaint against the plaintiff, alleging possession of weapons in a correctional institution, and causing the plaintiff to be subjected to criminal charges. Three and a half months after the plaintiff had been given a disciplinary report and sanctioned following an administrative adjudication, immediately after the conclusion of the DOC's Investigator - Capatain Kelly's interview with the plaintiff and finding no impropriety on behalf of the palintiff regarding the complaint against the food service supervisor at Cheshire C.I. Violates the

First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Article First, Sections 7, 9, and 20 of Connecticut's constitution.

46. The actions of Defendant William Blumenthal, in charging the plaintiff with the crimes of: Possession of weapons or dangerous instruments in a correctional institution, even though the evidence was insuffient to satisfy the elements of the crimes charged or sustain a conviction. Violated the Fourth and Fourteenth Amendments to the United States Constitution, as well as Article First, Sections 7, 9, and 20 of Connecticut's constitution.

47. The actions of Defendant Leo C. Arnone, in collaborating and approving the attempted procurement of the plaintiff's conviction for the alleged offenses of: Possession of weapons or dangerous instruments in a correctional institution, without probable cause or evidence to sustain a conviction. Violates the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Srticle First, Sections 7, 9, and 20 of Connecticut's constitution.

48. The actions of Defendant Sean McGuinness, in collaborating with the maliscious attempted procurement of the plaintiff's conviction, without evidence of a crime or evidence to support a conviction of the alleged charges of: Possession of weapons or dangerous instruments in a correctional institution. Violates the plaintiff's First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as

Article First, Sections 7, 9, and 20 of Connecticut's constitution.

49. The actions of Defendant Lance Morris, in commencing an investigation to an administrative complaint that was resolved and closed by an administrative body in 2007. His libelous allegations against another employee of the DOC [the food service supervisor], which in turn led to the filing of criminal charges against the plaintiff. After it was concluded from Captain Kelly's investigation that the plaintiff's action in editing a complaint for another inmate were not inappropriate. Violates the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Article First, sections 7, 9, and 20 of Connecticut's constitution.

50. The actions of Defendants Lance Morris, Captain Kelly, William Blumenthal, John Doe #1, Sean McGuinness, and Leo C. Arnone, in collaborating and malisciously subjecting the plaintiff to a criminal process with no probable cause and no evidence. For editing another inmate's complaint against a food service supervisor. Placed the plaintiff in peril of receiving an additional sentence. Violating the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as Article First, Sections 7, 9, and 20 of Connecticut's constitution.

VI. Request Relief.

Wherefore, the plaintiff requests that this Court grant the

following relief:

    A. Declare that Defendants Lance Morris, John Doe #1, Captain Kelly, Leo C. Arnone, William Blumenthal, and Sean McGuiinness violated the plaintiff's Fourth Amendment rights, when they, in collaboration, charged the plaintiff with criminal offenses for which there was no probable cause or evidence of a crime to sustain a conviction.

    B. Declare that Defendants Lance Morris, John Doe #1, Captain Kelly, and Leo C. Arnone, in collaboration, violated the plaintiff's First and Fourteenth Amendment rights, when they sought to procure the plaintiff's convicton for possession of weapons or dangerous instruments in a correctional institution, after the plaintiff was cleared of any wrongdoing following an investigation into a complaint that was filed against a CDOC food service supervisor.

    C. Declare that Defendants Lance Morris, John Doe #1, Captain Kelly, Leo C. Arnone, William Blumenthal, and Sean McGuinness violated the plaintiff's Federal and State constitutional rights against maliscious prosecution, retaliation, false arrest, abuse of legal process, and the equal protection clause. When the plaintiff was caused to be arrested by warrant on two counts of: Possession of weapons or dangerous instruments in a correctional institution, with no probable cause or evidence of a crime. Following an investigation into a complaint against a food service supervisor in the CDOC, for which the plaintiff was cleared of any wrongdoing.

D. Award compensatory damages in the following amounts:

1. Three thousand and five hundred ($3,500.00) dollars, jointly and severally against Defendants Lance Morris, John Doe #1, Leo C. Arnone, and William Blumenthal;

2. Two thousand and five hundred ($2,500.00) dollars, jointly and severally gainst Defendants Captain Kelly and Sean McGuinness;

E. Award punitive damages in the following amounts:

1. Four thousand and five hundred ($4,500.00) dollars, jointly and severally against Defendants Lance Morris, John Doe #1, Leo C. Arnone, and William Blumenthal;

2. Three thousand and five hundred ($3,500.00) dollars, jointly and severally against Defendants Captain Kelly and Sean McGuinness;

F. Award plaintiff the filing fee of this complaint, in the amount ofthree hundred and fifty ($350.00) dollars; and

G. Grant plaintiff such other relief as it may appear plaintiff is entitled to.

Respectfully submitted

*[signature]*
Ivan Diaz #213619
Plaintiff/Pro se
MacDougall-Walker C.I.
1153 East Street South
Suffield, CT 06080

Pursuant to 28 U.S.C. §1746, I declare under the penalty of purjury that the statements in this complaint are true and correct.

_Ivan Diaz_

Date: March 5, 2014